PEARSON, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 5:11CR077 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | |
| WARREN D. MORROW, | ) | |
| | ) | |
| Defendant. | ) | **ORDER** |

Defendant Warren Morrow moves the Court to suppress any and all evidence discovered

as the result of the search of his home, including his bedroom, and statements made in response

to questioning by the police both at his home and at the police station.

For the reasons provided below, Defendant's motion is granted.

## I. Factual Background

On January 19, 2011[1], at approximately 1:22 a.m., four or five two-man units of the

Akron Police Department responded to a call of a woman who claimed that she had been

confronted by a man with a gun when she banged on the back door of the residence located at

411 Noble Avenue, Akron, Ohio.[2]  ECF No. 17 at 2; ECF No. 18 at 1.

When the officers arrived in the area of Noble Avenue, Akron, Ohio, they met the alleged

---

[1]  Defendant's brief states the encounter occurred on February 22, 2011.  ECF No. 17 at 2.  At hearing, the Government's witnesses all agreed the events at issue occurred in January 2011. Defense counsel did not object.

[2]  Officer Wypasek testified that "four or five cars . . . responded, mostly two-man units."  Tr. 19 (Wypasek).  Officer Hielman, one of the backup officers who responded,  testified that maybe six officers were in Defendant's kitchen and the living room beyond the kitchen at one time. Tr. 36 (Hielman).  Officer Donohue testified that the number was "maybe four to five."  Tr. 61 (Donohue).

(5:11CR077)

victim who told the officers that she had given money to a man named "Carl" and asked him to

get drugs from a home on Noble Avenue.[3]  When "Carl" did not return, she went to the back

door of the home and knocked.  She was met by a man whom she said threatened her with a gun,

after she approached the door for the third time, looking for Carl.  ECF No. 18 at 1; *see also*

Tr. 111--112 (Defendant).  Investigating the  report, the police went to Defendant's Noble

Avenue residence and knocked loudly on the door.  Defendant  came to the door, asked who it

was through the locked door, and was told "Akron police."  He then unlocked the door.  ECF No.

17 at 2.

What happened next is in dispute.[4]  Defendant testified that, after he unlocked the door, a

number of Akron police officers pushed the door open, forcing their way into his home.  At least

---

[3]  The victim's story evolved.  She first told the 911 operator that she had been robbed at gunpoint by a male who then ran into Defendant's Noble Avenue residence.  TR. 54 (Donohue). Only when the police questioned her in person did she admit that she had given "Carl" money to buy drugs and (she believed) that he had gone into Defendant's Noble Avenue residence.  Tr. 54-55 (Donohue).

[4]  Several facts are in dispute regarding the events at issue, particularly regarding Defendant's alleged consent to the entry of the police and his physical location during questioning at his home and the search of his home.  The Government bears the burden of proving the consent to search was voluntary under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 2058-59, 36 L.Ed.2d 854 (1973).  This burden entails proving by "clear and positive" testimony that the consent was "unequivocal, specific, intelligently given and not influenced by any duress or coercion."  *U.S. v. Taylor,* 956 F.2d 572, 573 (6th Cir. 1992).  In making the analyses contained in this writing, the Court has carefully weighed and considered the credibility of the testimony of all, including the officers, and credited that found most credit worthy.

2

(5:11CR077)

one officer had his gun drawn and trained on Defendant.[5]  ECF No. 17 at 2; Tr. 103 (Defendant);

Tr. 91-94.  Defendant maintains the police did not seek nor did Defendant give his consent to

their entering his home.  ECF No. 17 at 2.

> Just inside of the doorway, Officer Donohue conducted a pat down search of Defendant.

Once inside, the other officers conducted a search–protective sweep– of the home, checking

rooms and waking sleeping people.  ECF No. 17 at 2; Tr. 61 (Donohue).  Officer Donohue

penned Defendant in the kitchen and testified that Defendant was not free to go.[6]  While in

Defendant's kitchen, Officer Donohue repeatedly asked "where's the gun" and "where's Carl"?

ECF No. 17 at 2.  Defendant answered that he did not know "Carl," that he had answered the

door with a broken flintlock pistol when the woman had knocked, and he had shown it to her.

Defendant claims he was then taken outside by the police officers.  ECF No. 17 at 2.

> The evidence consistently shows that Defendant was not given *Miranda* warnings at any

point prior to, during, or after being questioned in his home.  Tr. 63.  Officer Donohue, the first

to have contact with Defendant, confirmed that he repeated his questioning after receiving

Defendant's initial "no" responses and without having provided *Miranda* warnings, despite

knowing that Defendant's responses could be incriminating, to wit:

> Q. (Defense Counsel): All right.  Now, you did not
> *Mirandize* him at this point?

---

[5]  Officer Donohue testified that all entering officers had their guns drawn.  He holstered his to free his hands to pat down Defendant.  Tr. 59 (Donohue) ( "I reholstered my gun.  Other officers were cover.").

[6]  Whether Defendant was placed in handcuffs prior to his arrest is in dispute and further discussed below.

3

(5:11CR077)

> A: (Officer Donohue): That's correct.
> Q: You began interrogating him?
> A: No, sir.
> Q: You began asking him questions?
> A: Yes sir.
> Q: Okay.  Questions about whether there was a gun in the house?
> A: I asked him if he had a gun.
> Q: If he had a gun?
> A: Right.
> Q: Okay.  And that certainly could lead to an incriminating response?
> A: Yes, sir.
> Q: And he had first said no?
> A: Yes, sir.
> Q: And then you continued interrogating him?
> A: I continued to ask him questions.
> Q: Okay.  You continued to ask him questions, right?
> A: Yes, sir.

Tr. 63 (Donohue); *see also* Tr. 44 (Donohue) ("I was the contact officer.").

There is also no disagreement that, although it was in the middle of January and cold,

Defendant was made to stand outside of his home around 1:00 a.m. for about ten minutes,

wearing only a tank top, shorts and the boots he had been allowed to hastily step into.[7]  Tr. 31, 37

(Hielman).  He was not wearing a coat, although two officers testified that Defendant had asked

---

[7] Q. (Defense Attorney): All right. And he is wearing a white tank top and shorts?
A. (Officer Donohue): Yes, sir.
Q. And this is January 17th?
A. 19th.
Q. 19th 2011, right?
A. Yes, sir.
Tr. 60 (Donohue).

(5:11CR077)

for one.[8]  Officer Hielman's account on this point is poignant:

> Q: (Defense Attorney): Did you offer him a coat before you took him outside?
> A: (Officer Hielman): We actually – he did ask for one, and that's when they went back inside.
> Q: Okay, But when you took him outside, you didn't offer him a coat?
> A: I didn't– he never asked.
> Q: It was winter, right?
> A: Yeah.
> Q: And it was cold, you said?
> A: Yeah.
> Q: And there was a lot of snow?
> A: Yeah.
> Q: This was a rough winter, wasn't it?
> A: I'm from Ohio, so —
> Q: But it was a lot of snow this winter?
> A: Yeah.  There is a lot of snow every winter.
> Q: And there was a lot of snow that night?
> A: Yes, there was.
> Q: Okay.  And so when you took him outside, he didn't have a coat on?
> A: No.
> Q: Okay.  And he had to wait out there with you for about ten minutes?
> A: Yes.
> Q: And he was complaining about being cold?
> A: He had asked for a coat.  He didn't say, "I'm freezing," or anything of that nature.  He just said, "I'd like a coat."
> Q: What kind of shirt did he have on?
> A: I don't recall.
> Q: And then after saying he'd like to go inside, Officer Wypasek approached and said, "Can we talk inside?"

---

[8]  During the hearing, Officer Wypasek testified that "it was the middle of January, so it was cold, and the driveway was nothing but ice."  Tr. 6 (Wypasek).  Officer  Hielman corroborating that testified: "There was a lot of snow, actually.  The hill was icy.  A few of the other officers there were having a hard time getting up the hill."  Tr. 29 (Hielman).

(5:11CR077)

> A: He asked if he could have a coat, and [Officer
> Wypasek] said, "Well, why don't we talk inside,"
> and he said, "Okay," and they went inside.
> Q: Okay.  And then you don't know what happened
> in there?
> A: No.[9]

In significant contradiction to Defendant's version of events, the Government states that, after Defendant "answered the door and was patted him down for weapons, an unarmed Defendant granted the officers  permission to come inside and talk.  Defendant then led the officers into the home's kitchen.  While still in the kitchen, the officers asked Defendant if there was anyone else in the house.  Defendant indicated that his wife was in a basement bedroom. Knowing that there was an additional person in the house, and fearing that there was at least one additional weapon in the house, officers went into the basement to conduct a protective sweep for additional individuals.  Tr. 10 (Wypasek).  The officers entered the basement with their guns drawn and encountered Defendant's wife and her two year-old grandson and seventeen year-old daughter.  Tr. 91-92 (Gwendolyn); Tr. 25-26 (Wypasek).   The officers asked Defendant's wife if there was a gun in the bedroom and she said there was not.  She then gave the officers consent to search the bedroom.  Tr. 27 (Wypasek).  During this allegedly consensual search, the officers found a loaded handgun under the mattress.  ECF No. 18 at 2.

---

[9]  *See* Tr. 37-39 (Hielman).  There is disagreement about whether Defendant was permitted to reenter his home before being taken to the police station for more questioning after his arrest. Defendant testified that, after being removed from his home--after the initial entry of the police, pat down and questioning--he was not taken back inside.  Tr. 106, 120 (Defendant).  Officers Wypasek and Hielman testified that Defendant was permitted to reenter his home after he "said he was cold and wanted a coat"; in response to which  Officer Wypasek said: "Hey, you  know, can we talk inside," so they went inside.  Tr. 31, 39 (Hielman); *see also* Tr. 7, 22 (Wypasek).

6

(5:11CR077)

After finding the gun under the mattress, the Officers arrested Defendant and transported him to the police station where he was, again, questioned.  Prior to speaking with him, the officers maintain that Defendant was orally advised of his *Miranda* rights and then asked about the incident with the victim and the gun.  Choosing to speak, Defendant stated that he purchased the gun from a male known to him about eighteen months earlier for $70.  He then stated that the victim came to his door on three separate occasions and he told her to go away.  The last time, Defendant said he ordered her away while holding a gun.  ECF No. 18 at 2.

Defendant's account differs.  Defendant testified that, while at the police station, Officer Wypasek began to question him, stopped, *Mirandized* him and then continued with the questioning.  While Defendant admits that he was eventually *Mirandized* at the police station, he claims not to remember everything Officer Wypasek said but felt certain that he had not been told that he could stop answering questions at any time he wanted, to wit:

> Q. (Prosecuting Attorney): He told you that you could stop answering questions at any time you wanted?
> A. (Defendant): No, that's one thing he didn't say.
> Q. He never said that?
> A. No.

Tr. 123 (Defendant).  Ultimately, Defendant admitted to the ownership of the firearm referenced in the Indictment during the police interrogation.  ECF No. 17 at 3.

## II.  Discussion

### A.  Seizure

#### 1.  Controlling Law

The Fourth Amendment states:

7

(5:11CR077)

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be violated,
> and no Warrants shall issue, but upon probable cause, supported by Oath
> or affirmation, and particularly describing the place to be searched, and the
> persons or things to be seized.

U.S. CONST. AMEND. IV.

The controlling standard of a Fourth Amendment analysis is reasonableness.  Because the Fourth Amendment embodies the centuries-old principle of respect for the privacy of the home. *Wilson v. Layne*, 526 U.S. 603, 610, 119 S.Ct. 1692 (1999) (syllabus), a warrant or the consent to enter is a prerequisite for a legal search.  It is axiomatic that a non-consensual search, by the police, of private property, is *per se* unreasonable unless it has been authorized by a valid search warrant.  *See* *Katz v. United States*, 389 U.S. 347, 357 (1967).  More specifically, the Fourth Amendment "generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects."  *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Voluntary consent, however, is one of the exceptions to the warrant requirement.  Exigent circumstances is another exception to the warrant requirement.

"Whether consent is voluntary is a question of fact determined from the totality of the circumstances."  *United States v. Lopez–Medina*, 461 F.3d 724, 737 (6th Cir. 2006) (citing *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988)).  "The government has the burden to prove through 'clear and positive testimony' that the consent to search was given voluntarily." *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (internal quotation marks and citations omitted). "Consent is voluntary when it is 'unequivocal, specific and intelligently given, uncontaminated by any duress or coercion.'"  *Id*.  Courts have identified a number of factors that

8

(5:11CR077)

are often relevant to this totality of the circumstances determination, including the age,

intelligence, and education of the individual giving consent, whether the individual understands

that he or she has a right to refuse consent, whether the individual understands his or her

constitutional rights, the length and nature of any detention, and to what extent the police

engaged in coercive or punishing conduct. *See, e.g.*, <u>United States v. Elkins</u>, 300 F.3d 638, 647

(6th Cir. 2002). The Court's voluntariness analysis includes a consideration of "the

circumstances surrounding the search for 'more subtle forms of coercion that might flaw [an

individual's] judgment.'" <u>United States v. Moon</u>, 513 F.3d 527, 537 (6th Cir. 2008) (alteration in

original) (quoting <u>Schneckloth</u>, 412 U.S. at 227).

   Courts frequently consider both the time of an encounter and its location in determining

whether consent was voluntarily given. Consent given during daylight hours is far more likely to

be found voluntary than consent given at night. *See, e.g.,* <u>U.S. v. Washington,</u> 490 F.3d 765, 776

(9th Cir. 2007) ("Having carefully considered the totality of the circumstances in which

Washington gave his consent to his car being searched, we hold that the district court also clearly

erred in ruling that Washington's consent was voluntary. Given that it was late at night on a dark

street, that Washington had been led away from his car and seized by two police officers, and the

tension between the African-American community and police officers in Portland in light of the

prior shootings above-mentioned, we have no confidence that Washington's assent to the car

search was voluntary under the total circumstances."); <u>U.S. v. Ramirez-Chilel</u>, 289 F.3d 744, 751

n. 8 (11th Cir. 2002) ("Nighttime searches are deemed to be more intrusive than daytime

searches, and the assemblage of law enforcement officers at one's door in the middle of the night

(5:11CR077)

has a tendency to be more coercive than during the day."); _State v. Humphrey_, 138 P.3d 590, 595 (Utah App. 2006) ("One factor courts consider when reviewing the characteristics of consent is whether the incident occurred 'late at night.'").

Because courts tend to be particularly concerned with the coercive effect of officers appearing at a suspect's residence late at night seeking consent to search, they are likely to find consent involuntary under those circumstances. _See_ 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 8.2(b) at 63-64 (2004) (noting that "the atmosphere is certainly more coercive when the citizen-police confrontation comes about by the police rousing a person out of bed in the middle of the night").  Other factors may mitigate the coerciveness of those circumstances thus permitting voluntary consent.  _See, e.g., Ramirez-Chilel_, 289 F.3d at 751 n. 8 ("We have some concerns about the officers' decision in this instance to approach the defendant's home and seek his consent at midnight.  The magistrate judge also expressed his concerns in his report and recommendation about why it was necessary for this search to occur at 11:45 p.m. . . . That being said, however, we find that based upon the totality of the circumstances here, the fact that the search occurred at midnight does not by itself negate the voluntariness of Ramirez-Chilel's consent to search.").

Of additional relevance in a case wherein a defendant was in custody during the alleged constitutional violation, courts are unanimous in holding that the fact a person is in custody does not _per se_ render consent involuntary, the fact that a defendant gives consent while in a location under the control of law enforcement and while in custody are factors that courts consistently weigh in favor of a finding that it is not."  _U.S. v. Barnett_, 989 F.2d 546 (1st Cir. 1993)

10

(5:11CR077)

("sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody"); *see also Guzman v. State*, 283 Ark. 112, 119-20, 672 S.W.2d 656 (1984) ("The burden was upon the state to prove by clear and positive testimony that consent for the search of appellant's home was freely and voluntarily given.  When the defendant is in custody the burden on the state is particularly heavy.  Consent free and clear of fear or coercion under the circumstances of this case does not occur frequently.").

### 2. Application

### a. Consent to Enter Defendant's Home

While numerous factors must be considered in determining whether the Government has met its burden of establishing that Defendant consented to the entry of the police, given the disputed facts, this case largely turns on credibility.[10]  Defendant denies having consented to the entry of police.  ECF No. 17 at 2; Tr. 95 (Defendant).  He admits to unlocking a deadbolt but denies opening the door.  ECF No. 17 at 2; Tr. 103 (Defendant).  Rather, after he unlocked the door, he testified that the officers who had been first been banging on the front then the back door, forced their way in through the back door, pushing his back against a wall and then holding a gun on him.  ECF No. 17 at 2; Tr. 103 (Defendant).  Several of the officers then went past him and up the stairs into his kitchen and some went beyond that into his living room.  ECF No. 17 at 2; Tr. 103 (Defendant).  Defendant claims, after being patted down at gun point, he was

---

[10] *State v. Scarborough,* 201 S.W. 3d 607 623 (Tenn. 2006) (in considering whether consent is voluntary, "numerous factors come into play, including the time and place of the encounter; whether the encounter occurred in a secluded or public place; the number of officers present; whether hostility was present; whether weapons were displayed; whether consent was requested; and whether the individual initiated the contact").

(5:11CR077)

handcuffed and remained so during the entire encounter.[11]  Tr. 103-04 (Defendant).

Although conflicting evidence was presented regarding when Defendant was in

handcuffs, the evidence that he was in custody, *i.e.* under the control of law enforcement officers

during the entire encounter, is persuasive.  A seizure occurs when, "in view of all the

circumstances surrounding the incident, a reasonable person would have believed he was not free

to leave . . . ."  <u>United States v. Mendenhall, 446 U.S. 544, 554 (1980)</u>.  The Sixth Circuit has

noted that "[c]ircumstances indicative of a seizure include 'the threatening presence of several

officers, the display of a weapon by an officer, some physical touching of the person of the

citizen, or the use of language or tone of voice indicating that compliance with the officer's

request might be compelled.'"  <u>United States v. Jones, 562 F.3d 768, 772 (6th Cir. 2009)</u>

(quoting <u>Mendenhall, 446 U.S. at 554</u>).  Many of the indicia listed above presented itself during

this case–the threatening presence of several officers, the hour of the encounter, the display of

weapons, and the touching or frisking of Defendant.  As importantly, not only has the totality of

circumstances shown that a reasonable person would not have thought he was free to go, the

officers testified that Defendant was indeed not free to go during the encounter.

> Q. (Defense counsel): Okay.  So then you went into
> the kitchen with him?
> A. (Officer Wypasek): Correct.
> Q. And you had indicated *he was not free to go at*
> *this point*?
> A. *Correct*.
> . . .
> Q. There was an officer keeping him detained at that

---

[11]  The officers testified that Defendant was not handcuffed until arrested.  Tr. 21 (Wypasek); 36 (Hielman); 50-51 (Donohue).

(5:11CR077)

        point?
        A. Standing near him, correct.

*See* Tr. 22-23 (Wypasek)  (emphasis added).

        Q. (Defense counsel): And Mr. Morrow is in the house at that point?
        A. (Officer Hielman): Yes.
        Q. He's in the kitchen?
        A. Yes.
        Q. And he was not handcuffed?
        A. No.
        Q. But *he was not free to go?*
        A. *Not at that time.*
        Q. And he was not free to tell people to get out of his house?
        A. I mean, he could have at any time.
        Q. But he wouldn't have been free to leave the house?
        A. We were investigating a possible robbery, so, I mean, we wanted to talk to him.
        Q. I understand you wanted to talk to him and you wanted to be in the house. But, I mean, just so we're clear, do you believe he would have been free to leave?
        A. He didn't say he wanted to and didn't ask.
        Q. Okay. But there are six police officers with him in his kitchen at 1:30 in the morning?
        A. Yes.
        Q. And you don't know what was said to get -- you know, at the door when they entered, correct?
        A. Correct.

Tr. 36-37 (Hielman)  (emphasis added).

        Q. Okay. And he can see the officers going through the house, through his home with their guns drawn, right?
        A. No.
        Q. Well, he sees them go from the kitchen, because you have to go in the rest of the house through the kitchen, right?
        A. Yes.
        Q. So he sees all the other officers go through the

(5:11CR077)

kitchen and scatter through the house?
A. I don't know what he saw.
Q. Well, he wasn't standing in the kitchen with you with his eyes closed, was he?
A. I was talking with him.
Q. In the kitchen, right?
A. Yes.
Q. Were the lights on in the kitchen?
A. Yes.
Q. So he's aware of officers going past him with guns out going to the rest of the house to do a protective sweep, right, Officer?
A. I don't know, sir.
Q. Do you think it's possible that he might not have been aware of officers going past him in the kitchen with the lights on at 1:30 in the morning?
A. Sir, I don't know what he -- you are asking what he saw or didn't see. I was talking with him. I don't know if he saw that or not.
Q. He would have had to have vision problems to not see
it; is that a fair statement?
A. I don't know what he was concentrating on, sir.
Q. Do you think it's possible he was --
THE COURT: I've gotten the point. Move on.
MR. THOMPSON: Sorry, Your Honor.
THE COURT: Quite all right.
BY MR. THOMPSON:
Q. *So at this point, you wouldn't consider him free to leave at this point, would you*?
A. *No, sir*.

Tr.61-63 (Donohue) (emphasis added).

Officer Wypasek was not among the first to approach Defendant's residence.  He testified that, after he arrived on the scene, he spoke with the alleged victim outside for ten to fifteen minutes before approaching Defendant's residence.   Officer Donohue was the first to approach the residence and that he and Officer Donohue were separated approximately ten to fifteen

14

(5:11CR077)

minutes, after their initial arrival.  Tr. 5 (Donohue).  Officer Donohue  testified that he was the

"contact officer" who patted Defendant down.  In order to pat down Defendant, Officer Donohue

testified that  he "had to step in[side]" of Defendant's residence.  Tr. 45 (Donohue).  After

completing the pat down, Officer Donohue testified that he asked Defendant's permission to

come inside to talk and Defendant  consented.  They walked up a flight of stairs to Defendant's

kitchen wherein he asked Defendant  about pointing a gun at the woman and "Carl."  Officer

Donohue testified that through this part of the encounter, Morrow was not handcuffed.  Tr. 50-

51.

  Having carefully considered the totality of the circumstances under which Defendant

allegedly consented to the entry of the police, the Court finds that the consent, if given, was not

voluntary.  The Government has failed to successfully carry its burden that Defendant's alleged

consent was "unequivocal, specific and intelligently given, uncontaminated by any duress or

coercion."[12] _United States v. Ivy_, 165 F.3d at 402   Defendant was alerted to the presence of the

police by banging at the front and then the back doors of his home at shortly after 1:00 a.m.

Whether he opened the door or just unlocked it is not dispositive.  Officer Donohue's testimony,

however, that several officers entered with their guns drawn and he proceeded to pat down

Defendant is quite compelling.  Such a nighttime or early morning entry coupled with the show

of force evident from the record and testimony that Defendant was not free to go nor,

realistically, free to make the police leave his residence are factors more likely to lead to a

---

[12]  _State v. Dunn_, 850 P.2d 1201, 1219 (Utah 1993) ("We agree with Dunn's contention that the
prosecution's burden is 'particularly heavy' when the defendant's consent was obtained while he
or she was in custody.").

(5:11CR077)

coerced rather than voluntary consent.[13]  Considered together, the evidence presented does not

provide the Court confidence that Defendant voluntarily consented to the initial entry of the

police.[14]

      Continuing the analysis, the record reflects no exigent circumstances justifying the

warrantless entry.  Exigent circumstances permitting a warrantless search are present as a matter

of law (1) to engage in hot pursuit of a fleeing felon; (2) to prevent the imminent destruction of

evidence; (3) to prevent a suspect from escaping; and (4) to prevent imminent harm to police or

third parties.  *United States v. Washington*, 573 F.3d 279 (6th Cir. 2009).  Inquiry in determining

whether exigent circumstances existed to justify a warrantless search focuses not on an officer's

subjective intentions, but on whether an objectively reasonable officer could have believed that

---

[13]  As detailed in footnote 9, Officers Wypasek and Hielman testified that Defendant was cold, wanted a coat and agreed to go inside to talk.  Defendant denies that he was permitted to reenter his home.  Nevertheless, giving the Government the benefit of the doubt, given the cold temperature, wintry conditions and his lack of suitable outdoor clothing, an affirmative response would be of no surprise.  An affirmative response, if given, would have been derived  more from coercion than voluntary agreement.

[14]  Although not argued by the Government, alternatively, a brief investigatory stop based upon specific articulable facts that gave rise to a reasonable suspicion that Defendant was engaged in criminal activity may have justified the entry and a brief encounter to permit the police to satisfy themselves that an armed man hiding out in Defendant's residence had not just robbed a victim. *See O'Malley v. City of Flint*, --- F.3d ---, No. 09-2037, 2011 WL 3055227, at *5 (6th Cir. 2011) (discussing that the "reasonable suspicion" standard to briefly detain a person requires sufficient evidence opposed to "conclusive evidence").  Had reasonable suspicion for such an encounter existed, the degree of intrusion–the search of the basement--exacted by the officers was not justified.  Defendant, who matched the victim's description could have easily been removed from the home when he "opened" the door.  The officers would, thereby, have been assured that Defendant no longer posed a danger.  And, if supported by probable cause, the officers could have maintained the *status quo* and sought a warrant permitting them to legally enter and search the home.

16

(5:11CR077)

exigent circumstances existed.  _Brooks v. Roth_, 577 F.3d 701 (6th Cir. 2009).  The victim

claimed she had been robbed and eventually admitted to having voluntarily given her money to

"Carl" who failed to come back with her promised drugs.  Believing "Carl" had gone into

Defendant's residence, she called 911.  Even Officer Donohue admitted that "Carl" had pulled

one over on the victim.  Tracks left in the snow strongly suggested that "Carl" had run through

Defendant's yard and never entered Defendant's residence. Tr. 55 (Donohue); _see also_  Tr. 39

(Hielman).

    The Fourth Amendment does not require police officers to delay in the course of

investigation if to do so would gravely endanger their lives or the lives of others.  _Warden v._

_Hayden_, 387 U.S. 298, 299 (1967).  There has been, however, no evidence presented in this case

suggesting the need to act quickly.  There was no "hot pursuit."  In fact, Officer Wypasek spoke

with the victim ten to fifteen minutes before he ever approached Defendant's home.  Tr. 5

(Wypasek).  Officer Donohue, the first to approach had, almost immediately, under his control

Defendant--a male fitting the victim's description of the man who answered the door with a gun.

Tr. 43-44 (Donohue).  There was, at that point, no justification for a search without consent.  The

better course of action would have been to maintain the _status quo_ or remove Defendant from the

home and request a warrant, if probable cause existed. The evidence does not show that it was

appropriate to search Defendant's home.  It appears the police were in search of evidence–a gun

17

(5:11CR077)

fitting the victim's description, having found nothing of the sort during the initial approach.[15]

### b.  Protective Sweep

The evidence in this case has not shown that a protective sweep was justified after Defendant was restrained.  The Government has not demonstrated any articulable facts that would lead to the rational inference of a threat requiring a protective sweep after Defendant had been frisked, was under control of the police, and was quite possibly standing outside by the time the protective sweep occurred.  *See id.*; *Maryland v. Buie*, 494 U.S. 325, 334 (1990). Nevertheless, viewing the facts in the light most favorable to the Government, and, thereby assuming a protective sweep was necessary to ensure that no individual posing a danger lurked, the search under the mattress is suspect and deserving of its own analysis.  *See also United States v. Colbert*, 76 F.3d 773, 777 (6th Cir.1996) (a protective sweep of a residence, conducted after an arrest has been made outside the residence, is justified only if the officers can demonstrate an articulable basis for their reasonable belief "that someone else inside the house might pose a danger to them").

Although the police allege it was a search conducted with the wife's consent and not the protective sweep that yielded the weapon specified in the Indictment against Defendant, the Court will consider the effect of the unlawful sweep on the wife's consent to the search under the mattress where the gun at issue was found.  *Cf. United States v. Edgerson*, 243 Fed. Appx. 974,

---

[15]  The Supreme Court has clearly ruled that "search warrants 'may not be used as a means of gaining access to a man's house, office and papers solely for the purpose of making search to secure evidence to be used against him in a criminal [] proceeding.'"  *Warden*, 387 U.S. at 302.

(5:11CR077)

975 (6th Cir. 2007) (denial of suppression affirmed when at the time the roommate/girlfriend

gave consent, she did not know that the protective sweep had occurred, although she could see

that Defendant had been arrested).

### c. Wife's consent to Search Beneath Mattress

When the prosecution seeks to justify a warrantless search with proof of voluntary

consent, it need not demonstrate that the defendant gave consent if it can show that a co-tenant

with "[her] own right" to permit the inspection consented to the search, and no present co-tenant

objects. _United States v. Matlock_, 415 U.S. 164, 171-72 (1974).

Defendant's wife was present in the basement while the police officers conducted a

"protective sweep." Defendant's wife testified that the officers, before asking permission to look

under the mattress were "just going through everything, my drawers and stuff." Tr. 96

(Defendant's Wife). She also testified that to prevent a drawer that sticks from being broken, she

offered to open it for the officers: "They looked in my drawers, they tried to–one of our drawers

is, like, stuck, and so they was trying to open that. And I was like, you know, "Do you want me

to open it?" "Because I don't want them to break my stuff. So I opened it." Tr. 96 (Defendant's

Wife). Against that backdrop, when asked to get up off of the bed so the officers could look

under the mattress, she said "yes" because she thought they would look anyway. Tr. 98.

> Q. (Defense Attorney): Did they ask permission to
> look under the mattress?
> A. (Defendant's Wife): Yes. They asked us to get up
> and asked could they look under the mattress, yes.
> Q. And what did you say?
> A. "Yes."
> Q. Okay. Why did you say that?

19

(5:11CR077)

> A. Because I thought they was going to look anyway. They
> was looking everywhere for -- I meant, they was looking
> through our house anyway, so I thought they was going to
> look anyway, make us get up and look anyway.

Tr. 97-98.

Officer Wypasek testified that, in accordance with the standard practice of the Akron Police Department, he and the other officers had their guns drawn when they descended the stairs into the basement where Defendant's wife and child were, to perform a protective sweep.[16] Officer Wypasek also testified that after he gave "the nod" indicating that no one else was hiding in the basement, he holstered his firearm and assumed the other officers did as well before he asked the wife for permission to look under the mattress where the weapon at issue was found.

Where a person is located when officers seek consent to search is a relevant factor in considering whether the consent was voluntarily given under the totality of the circumstances. *See, e.g., U.S. v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001) (discussing location where consent given a factor to be considered in determining whether consent given voluntarily).

The Court finds credible the wife's explanation that she agreed to move so the underside of the mattress could be searched because she felt the officers would "make us get up and look anyway." Tr. 98.  Although the wife had legal authority to consent, given the totality of circumstances, including  the nature of the initial illegal entry into the residence, the illegal

---

[16]  Evidence shows that Defendant's wife was in the basement with her two year-old grandson and seventeen year-old daughter.

(5:11CR077)

protective sweep which exposed her and two minor children at 1:00 a.m., while in her bedroom, to several armed officers, her consent was not voluntarily given; it was more likely borne of fear or coercion.[17]/[18]

### B. Statements

#### 1. Relevant Law

The relevant portion of the Fifth Amendment to the United States Constitution provides:

No person . . . shall be compelled in any criminal case to be a witness against himself . . . without due process of law.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established "certain procedural safeguards that require police to advise criminal suspects of their rights under the

---

[17] Although Officers Wypasek and Donohue both testified to having their guns drawn when they entered the basement and while conducting the protective sweep and holstering after completing the protective sweep, Tr. 25 (Wypasek); Tr. 58 (Donohue), neither Defendant's wife nor their seventeen year-old daughter recalled seeing the officers with their guns drawn when the officers were first seen in the basement. Tr. 94-95 (Defendant's Wife); Tr. 79 (Defendant's Daughter). This is consistent with the wife's testimony that she "turned the light on, because they had the flashlights in [her] eyes." Tr. 93 (Defendant's wife).

[18] Officer Donohue testified that the gun was "in plain view, once we lift[ed]" the mattress. Tr. 49 (Donohue). Although the plain view exception has not been offered as justification for seizing the weapon, in hopes of creating a complete record, the Court responds to that testimony. The Supreme Court has held that three conditions must be satisfied to justify a warrantless seizure pursuant to the plain view exception: (1) the seizing officer must not have violated the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed"; (2) the item must not only be in plain sight, but "its incriminating character must also be immediately apparent"; and (3) the officer must be lawfully located in a place from which the object can be plainly seen, and he must also have a lawful right of access to the object itself. *U.S. v. Hunter*, 333 Fed. Appx. 920, 925 (6th Cir. 2009) (quoting *Horton v. California*, 496 U.S. 128, 136-37 (1990)). The gun at issue was obviously not immediately apparent until after the mattress was raised. The plain view exception is, therefore, not applicable to the fact of this case. For that reason and also because the initial entry was illegal negating the lawful presence of the officers, the gun referenced in the Indictment was not in plain view when found.

(5:11CR077)

Fifth and Fourteenth Amendments before commencing custodial interrogation." _Duckworth v._
_Eagan_, 492 U.S. 195, 201 (1989).  While the choice of words can vary, the warning must
"reasonably convey to a suspect his rights as required by _Miranda_." _Florida v. Powell_, —U.S.
—, 130 S.Ct. 1195, 1204 (2010).  The _Miranda_ Court held:

> Prior to any questioning, the person must be warned that he has a
> right to remain silent, that any statement he does make may be used as evidence
> against him, and that he has a right to the presence of an attorney, either retained
> or appointed

_Miranda_, 384 U.S. at 444.  "No amount of circumstantial evidence that the person may have
been aware of this right will suffice to stand in its stead.  Only through such a warning is there
ascertainable assurance that the accused was aware of this right." _Id._ at 471-72.

    The rights advised of in _Miranda_ warnings can be waived provided that the waiver is
made "voluntarily, knowingly, and intelligently." _Id._ at 444.  Courts apply a two-step process
when evaluating the validity of a waiver.  First, the waiver must be voluntary in the sense that it
was a free and deliberate choice rather than the product of intimidation, coercion, or deception.
_Moran v. Burbine_, 475 U.S. 412, 421 (1986).  Second, the waiver must have been made with an
awareness of the nature and consequences of the rights being waived. _Id_.  The totality of the
circumstances must show that the waiver  was uncoerced and that the consequences were
comprehended.

    An express written or oral statement of waiver is not required. _North Carolina v. Butler_,
441 U.S. 369, 373 (1979); _United States v. Miggins_, 302 F.3d 384, 397 (6th Cir. 2002).  Where
the prosecution shows that _Miranda_ warnings were given and that they were understood by the

22

(5:11CR077)

accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.  *Berghuis v. Thompkins*, 560 U.S. —, 130 S.Ct. 2250, 2262 (2010).

### 2.  Application

#### a.  Statements  Made At Defendant's Home

In this case, the evidence clearly establishes that Defendant was not provided *Miranda* warnings before or during the questioning at his home.  Tr. 22 (Wypasek), 63 (Donohue), 95 (Defendant).  The evidence also clearly establishes that Defendant was in custody, *i.e.*, not free to go, the entire time the police were at his home.  Tr. 23 (Wypasek), 36 (Hielman), 62-63 (Donohue).

Therefore, considering the totality of the circumstances, including the restraint on Defendant's movements, the officers failure to give Defendant *Miranda* warnings eliminated any possibility that he waived the rights attached.  Accordingly, for the reasons more fully explained below, the statements made in Defendant's home are suppressed.

Despite the conflicting testimony, overall, the evidence shows that the police, uninvited, entered Defendant's home in the early hours of the morning, brandished their weapons, patted him down, and controlled his movements before and while he made certain of the statements Defendant now seeks to suppress.  The Court credits the testimony of Officer Wypasek who candidly admitted that Defendant was detained while being questioned in his kitchen.  Tr. 23 (Wypasek); *see also* Tr. 36 (Hielman); Tr, 62-63 (Donohue).  Out of concern for officer safety, Wypasek testified that Defendant was not free to leave when he was standing outside of his home after having been patted down nor was he free to leave while he was questioned in his kitchen.

23

(5:11CR077)

Officers Hielman and Donohue agreed that Defendant was not free to go or move around.  Tr. 36 (Hielman) 62-63 (Donohue).  While Officer Wypasek testified that he did not know whether Defendant had been provided his *Miranda* warnings, Officer Donohue's testimony that he persisted in questioning Defendant without having provided Defendant *Miranda* warnings and with the knowledge that Defendant's responses could be incriminating is decisive.  Tr. 63 (Donohue) (reprinted herein at pages 3-4).

An interrogation in one's home is not determinative of the custodial inquiry; rather, it usually indicates an absence of the isolation inherent in custodial interrogations.  *See Beckwith v. United States*, 425 U.S. 341, 346 n.7 (1976) (finding that the suspect, who was questioned in his home, "hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding[,]" because Miranda concerned "the principal psychological factor" of "isolating the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner'") (quoting *Miranda*, 384 U.S. at 457).

Whether Defendant reasonably believed he was "free to leave" is an aspect to be considered in a Fifth Amendment custody determination.  In *United States v. Salvo*, the Sixth Circuit recognized that a statement by an officer to a suspect that he was free to leave or to request the officers to do so is an important factor in finding that the suspect was not in custody.  133 F.3d 943, 950 (6th Cir. 1998) ("[C]ourts may consider, as one component or aspect of the totality of the circumstances under which the suspect is questioned, whether a reasonable person in the suspect's position would have felt free to leave").  In the instant case, the restraint on Defendant's freedom of movement while the officers were present in his home emphasizes the

24

(5:11CR077)

custodial nature of Defendant's interrogation and was confirmed by the testimony of Officers Wypasek, Hielman and Donohue.  *See* Tr. 23 (Wypasek); 36 (Hielman); 62-63 (Donohue).  Not only could Defendant have reasonably thought that he was not free to go, he in fact was not free to go or otherwise move about.[19]

The *Salvo* Court acknowledged that whether a suspect is "free to go" is not dispositive of the custody issue and identified other factors that courts have relied upon, including: "(1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions." 133 F.3d at 950.  Several of these factors, in addition to the restraint on Defendant's freedom, inform the Court's decision in the instant case.

At shortly after 1:00 a.m., Defendant was questioned about a seriously incriminating matter; in a hostile environment–surrounded by police officers who had forced their way into his

---

[19]  The testimony of Defendant and the officers differ on when Defendant was handcuffed.  This conflicting testimony is not significant to the "in custody determination" given the other indicia of being in custody regardless of when Defendant was actually handcuffed.  *See*  Tr. 103-04. (Defendant)  Defendant testified that, after being patted down, Officer Donohue placed him in handcuffs and he asked the officer why he was under arrest.  Tr. 103 (Defendant).  Officer Donohue responded that he was not under arrest and proceeded to ask him about the alleged victim.  Tr. 103 (Defendant).  On the other hand, Officer Wypasek testified that he handcuffed Defendant but not until after the gun under the mattress had been found.  Tr. 14 (Wypasek).

(5:11CR077)

home and brandished weapons upon their initial entry and again upon learning that Defendant

was not in the home alone; his movement was restrained to either his kitchen or standing outside

of his home in a tank top and shorts without a coat on a cold winter night while responding to

questions initiated by the police.[20]   The objective circumstances of the home interrogation in the

instant case more closely resembles a custodial investigation than mere questioning in a coercive

environment.  _Salvo_, 133 F.3d at 948.  A reasonable person in Defendant's position would not

have felt in control of his person, surroundings, or the interrogation.  _See Miranda_, 384 U.S. at

457.

   Given the totality of the circumstances, the early morning intrusion upon Defendant's

privacy paints the picture of a person who reasonably would have felt threatened and coerced into

making a statement.  _Miranda_ warnings should have been given and his rights voluntarily waived

before Defendant was questioned in his home.  Because this did not occur, Defendant's motion

to suppress the statements made at his home is granted.

---

[20]   _See e.g._ Officer Wypasek's testimony that, while in the kitchen, Defendant would not have
been free to open the refrigerator.

> Q. (Defense Counsel) At that point, if he had tried
> to walk out of the -- I mean, he was being detained
> at that point in the kitchen, too, right?
> A. (Officer Wypasek) Yes. Okay. So he wasn't free
> to go at that point either?
> A. No.  Again, I mean, he's not really free to move
> around, get something out of the refrigerator,
> anything like that.  For officer safety and for
> everybody's safety on the scene, it's pretty
> imperative that they're not allowed to retrieve
> things or go in other rooms, because we don't know
> what's there.

Tr. 24-25 (Wypasek).

(5:11CR077)

### b.  Statements Made at the Police Station

The statements made by Defendant at the police station require a separate analysis.  The question to be answered is whether the earlier events–illegal entry and seizure and solicitation of unwarned statements that occurred prior to Defendant's statements at the police station–incurably taint the later made post-*Miranda* statements.  *Coomer v. Yukins*, 533 F.3d 477, 489-92 (6th Cir. 2008).  If the answer to this inquiry is no, the Court must then consider whether the *Miranda* warnings given after the interrogation began were effective.  *Id*; *see* *Missouri v. Seibert*, 542 U.S. 600, 604, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), (Justice Souter, joined by Justice Stevens, Justice Ginsburg, and Justice Breyer, concluded that, because the midstream recitation of warnings after interrogation and unwarned confession in this case could not comply with *Miranda*'s constitutional warning requirement, Seibert's postwarning statements are inadmissible).  Notwithstanding evidence that the incriminating statements made by Defendant in his home were in violation of *Miranda*, suppression of the statements made at the police station would not be appropriate absent a causal connection between the two statements or some other independent reason.  The  Supreme Court spoke directly to this circumstance in *Oregon v. Elstad*:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made.

27

(5:11CR077)

470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).[21]  *See* <u>Coomer</u>, 533 F.3d at 489.

("[T]here was a time lapse of approximately three hours between the written statement . . . and

the second oral statement at the police station . . . the statement given at the police station is

sufficiently disconnected from the prior written statement that the later oral statement cannot be

considered the fruit of the poisonous tree.").

     Officer Donohue testified that Defendant had been in custody for approximately thirty

(30) minutes by the time he was interrogated at the police station.  Tr. 49, 50 (Donohue).  And,

the questioning at the station lasted no longer than fifteen (15) minutes.  Tr. 53 (Donohue).

     Even assuming that the thirty minutes in custody includes the time Defendant claims to

have been handcuffed and waiting outside, Defendant's statements made at the police station

were not sufficiently temporally or otherwise removed from the taint of the earlier *Miranda*

violation.  Defendant's questioning at the police station did not present a "new and distinct"

experience for several reasons.  *See* <u>Coomer</u>, 533 F.3d 491 (station house questioning was seen

as a new and distinct experience after defendant had given an unwarned statement and several

hours later, at the police station, defendant was questioned after being given *Miranda* warnings).

     First, there had not been a sufficient break in time between Defendant's statements made

at his home and those made at the police station.  The taint attached to the pre-police station

---

[21]  *Elstad* involved a young suspect who was interrogated without being *Mirandized* by police in
his home, where he first confessed to a crime.  After the suspect was taken to the police station
and given proper warnings, he again confessed.  The suspect argued at trial that his second
confession should not be admitted because it was the fruit of the first tainted confession.  The
Supreme Court refused to adopt the suspect's "cat out of the bag" theory and held that "a
careful and thorough administration of *Miranda* warnings serves to cure the condition that
rendered the unwarned statement inadmissible."  <u>Id.</u> at 310-11.

(5:11CR077)

interrogation was so violative of Defendant's constitutional rights as to have a reach lasting much

longer than the thirty minutes that had elapsed between the events at Defendant's home and the

interrogation at the police station, thereby eliminating the possibility that Defendant could see the

eventual offering of *Miranda* warnings as "presenting a genuine choice whether to follow up on

the earlier admission." *Id.* (citing *Siebert*, 542 U.S. 615-16).  There was little likelihood that

Defendant's "new circumstances at the [police] department 'placed [him] in a position where

[he] could make an informed choice about whether to waive [his] constitutional rights.'" *Id.*

Next, there was not a sufficient break in the circumstances surrounding the police station

interrogation to place Defendant in a position wherein he could make an informed choice about

whether to waive his constitutional rights.  *Cf. Coomer*, 533 F.3d at 491.  At the police station,

Defendant was accompanied and questioned by the same police officers who had been at his

home--Officers Wypasek and Donohue.  Officer Donohue testified:

> Q. Where do you take him?
> A. We take him to the police department, to the
> detective bureau where we do our interviews.  We
> place him in one of the interview rooms.
> Q. Then did you sit down and talk to him at that
> point?
> A. We both did, yes, sir, myself and Officer
> Wypasek.

Tr. 50 (Donohue).  Because Defendant reasonably believed that he had been in custody at his

home all along, his presence in the police station with the same officers who had restrained him

at his home presented no notable change of circumstances that would have encouraged him to

voluntarily make statements disconnected with those previously made at his home.

29

(5:11CR077)

Additionally, the questioning at that station began with one of the officers who had been at Defendant's home asking "Well, what if I told you I found a 9 millimeter pistol up under your mattress?" before interrupting the questioning to give Defendant *Miranda* warnings.  Tr. 108 (Donohue).  This sequence–question before *Miranda* warnings-- presents two problems.  The referral to the illegally seized gun *prior* to giving *Miranda* warnings rendered the warnings ineffective by creating an impression that this questioning–at the police station with the same officers--was a continuation of and intertwined with the earlier illegal questioning and seizure.  It is also troubling that the questioning relied upon fruit of the illegal search at Defendant's home. *Seibert*, 542 U.S. at 616.  The illegal entry made the evidence seized the fruit of the poisonous tree.  Evidence derived from a line of questioning that began by referring to that illegally seized evidence is incurably tainted.  Furthermore, Defendant may reasonably have felt unduly obligated to respond to questions posed about the gun seized, albeit illegally, from his home.

Defendant's motion to suppress the statements made at the police station is granted.

### III.  Conclusion

For the reasons given above, the Court finds that the police's initial entry into Defendant Warren D. Morrow's home was without a warrant or consent and not justified by exigent circumstances.  The entry was, therefore, illegal.  The subsequent search, including the protective sweep,  was illegal.  The consent of the wife to the search under the mattress was not freely and voluntarily given, rather it was borne of fear and/or coercion.  The statements made by Defendant at his home were made while he was in custody and without him having been provided *Miranda* warnings and, consequently, without a waiver of those warnings.  Because the entry into

30

(5:11CR077)

Defendant's home and the seizing of the gun at issue were inextricably intertwined with his

questioning at the police station, the statements made by Defendant at the police station are fruit

of a poisonous tree.  Therefore, the motion to suppress is granted and all evidence and statements

at issue are suppressed.

      This matter is set for Trial to commence on August 15, 2011 at 8:30 a.m.  The Final

Pretrial is August 12, 2011 at 12:30 p.m.

IT IS SO ORDERED.


August 2, 2011                         *s/ Benita Y. Pearson*
Date                                     Benita Y. Pearson
                                             United States District Judge